IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH RONALD KNAUSS,** | : | **CIVIL NO. 1:CV-08-1698** |
| | : | |
| **Plaintiff** | : | **(Judge Rambo)** |
| | : | |
| **v.** | : | |
| | : | |
| **ROBERT D. SHANNON,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

# M E M O R A N D U M

Plaintiff Joseph Ronald Knauss ("Knauss") initiated this civil rights action

on September 15, 2008 with a complaint filed pursuant to the provisions of 42

U.S.C. § 1983, (Doc. 1), as amended September 25, 2008 (Doc. 9), while confined

at the State Correctional Institution at Fayette, in LaBelle, Pennsylvania ("SCI-

Fayette"). Knauss sets forth allegations against several employees of the State

Correctional Institution in Frackville, Pennsylvania ("SCI-Frackville"), his former

place of confinement.[1] He contends that Defendants violated his constitutional

rights when he was assaulted by Defendant Hannon on June 12, 2008, and

subsequently denied food trays, recreation, and showers when placed in

_____

[1] Plaintiff names as defendants in the amended complaint Robert D. Shannon, Superintendent of SCI-Frackville; Joseph Hannon, sergeant/correctional officer at SCI-Frackville; and Winston Wagner, a correctional officer at SCI-Frackville. Defendants note in their statement of material facts that Winston Wagner's correct first name is "William." (Doc. 91 at 1 n.1.)

administrative custody while prison officials investigated the June 12 incident. Plaintiff further claims that on July 15, 2008, Defendant Shannon destroyed his legal books, legal mail, and grievances in connection with the June 12 incident and his subsequent placement in administrative custody. Plaintiff seeks compensatory and punitive damages.

Before the court is a motion for summary judgment filed on behalf of Defendants. (Doc. 87.) For the reasons set forth below, the motion will be granted as to Defendants Shannon and Wagner. Further, the motion will be denied as to Defendant Hannon.

## I.   Background

The following facts are related to Knauss' claims. The court notes any factual disputes between the parties by presenting both parties' contentions.

### A.   June 12 Incident

On June 12, 2008,[2] at approximately 7:05 p.m., Knauss was called out of his cell by Corrections Officer ("CO") Megan White through the housing unit's intercom system. (Doc. 9 ¶ 8; Doc. 91 ¶ 2.) Upon exiting his cell, Knauss was

---

[2] Knauss' amended complaint asserts that the date of the incident was July 12, 2008; however, the parties agree that the date should be June 12, 2008 rather than July 12, 2008. (*See* Doc. 91 at 2 n.2; Doc. 101 at 1.)

met by Defendants Hannon and Wagner, who searched him and then took him to

the Unit Manager's office and shut the door. (Doc. 9 ¶¶ 11-14; Doc. 91 ¶ 2.)

Knauss alleges that once they were in the office, Defendant Hannon

punched him in the chest, knocking him into a chair, and verbally threatened him

because Knauss had been discussing CO White in a personal way, such as

addressing her by her first name, in order to be transferred to another institution.

(Doc. 9 ¶¶ 16-28; Doc. 91 ¶ 3.) Knauss claims that he then went back to his cell

and showed inmates Thomas Shock and Mike Benson the injury to his chest.

(Doc. 9 ¶ 29; Doc. 91 ¶ 4.) He also claims that inmates Shock and Benson

witnessed part of the incident. (*Id.*)

Knauss reported the incident to the shift commander, security and medical

departments, and United States District Judge J. Curtis Joyner.[3] (Doc. 9 ¶ 30; Doc.

---

[3] At the time of the events referenced in this case, Knauss had a lawsuit pending in the Eastern District of Pennsylvania before Judge Joyner. (Doc. 91 ¶ 20.) In that case, Knauss alleged that he overdosed on drugs while on parole and subsequently was taken to Lehigh County Prison ("LCP") where several guards there entered his cell "'and without warning assaulted [him] numerous times' and that . . . 'one of the guards stood on his chest causing his lung to collapse and he believes that 'these defendants kicked and struck him numerous times to the head and body.'" (Doc. 90-10 at 2, *Knauss v. Anthony, et al.*, No. 07-cv-2935 (E.D. Pa. Aug. 12, 2008).) Judge Joyner granted summary judgment in favor of the Defendants, finding, *inter alia*, that "there is absolutely no evidence in this case to substantiate the plaintiff's claims that the defendants were deliberately indifferent to his medical needs or that his physical condition resulted from the malicious and sadistic use of excessive force against him by LCP officers." (*Id.* at 13-14.)

91 ¶ 5.)  Photographs of his chest injury were taken, medical reports processed, and he was treated for redness and soreness on his chest.  (*Id*.)

On June 13, 2008, Intelligence Captain David Kneal initiated an investigation into the incident at the request of Superintendent Shannon.  (Doc. 9 ¶ 31; Doc. 91 ¶ 8.)  As part of the investigation, interviews were conducted and statements taken from Defendants Hannon and Wagner, as well as various other corrections officers and inmates Knauss, Shock and Benson.  (Doc. 90-2 ¶ 4, Ex. A, Unsworn Decl. Of Captain D. Kneal; Doc. 91 ¶ 9.)

Knauss provided written statements of his account of the June 12th exchange.  In one statement taken on the evening of June 13, 2008, Knauss stated:

> On 6/12/08 at 7:05 p.m., I was woke up by my cellmate Thomas Shock . . . and he told me that CO White called me out to the A-block bubble off A-A-9 cell.  I walked out to the A-block bubble and CO Wagner and Sgt Hannon was standing outside the A-wing door, Sgt Hannon put me up against the A-wing door and kicked my feet apart and pat searched me, he then told me to shut up and walk to Unit Manager Miranda's office, and he said you'll go head first to the ground if you try anything.  I opened the door and went in the UM's office.  After I went in and CO Wagner and Sgt Hannon went in, CO Wagner shut the door.  Sgt Hannon said sit down, he then without warning punched me in my chest and I fell into the chair.  He sat down and said I want the fucken truth, what did you tell somebody about CO White.  He asked me if I knew her sister Cory and I said no. He asked me how I knew her name was Megan, also he asked how I knew his name was Joseph and CO Wagner's name was Winston, I told him an ex-inmate Yaronicky told me.  He said does security know about Ms. White.  I said no.  He said I know what your trying to

4

do, your trying to use her to get transferred out of SCI-Frackville. He said I outa knock you the fuck out. He then said if I here any other stuff about this or you tell your celly or any staff member or security I will put a hole in your chest. He also stated you'll get out of here after I get down with you. I then told him I understand. He also stated to me that if I tell security about his assaulting me in the UM's office he will kill me.

(Doc. 90-2 at 20-22, Knauss statement, June 13, 2008.)

Defendants Hannon and Wagner each provided written statements of their accounts of the June 12 incident. Defendant Hannon stated that he called Knauss into the Unit Manager's office on June 12 to discuss with him the impropriety of using corrections officers' first names in the institution. (Doc. 90-2 at 5, Ex. 1, Investigation Report.) He denied using profanity towards Knauss or threatening him. (*Id*. at 6.) He also denied physically striking or assaulting Knauss. (*Id*.) Defendant Wagner stated that Defendant Hannon had called Knauss in for the meeting to counsel him about addressing staff by their first names. (*Id*.) Additionally, he stated, "Sgt. Hannon did not hit the inmate. There were no threats. He was professional when dealing with the inmate. I was standing in the office between the table and the door. I didn't say anything." (*Id*.)

Inmate Benson also was interviewed and provided a written statement. He stated that early on June 12 Knauss told him that because he disliked CO White and Defendant Hannon, he was going to set them up by accusing Defendant

5

Hannon of beating him and threatening him.[4] (*Id*. at 6-7.) Later that same day, when inmate Benson came in from evening yard at 7:45 p.m., Knauss told him that he had been assaulted by Defendants Hannon and Wagner. (*Id*. at 7.) At 8:35 p.m. that same evening, inmate Benson went to Knauss' cell, where Knauss told him that "he was hitting himself, doing push ups, hitting his chest off of the floor and used hot rags to make it look like he got hit." (*Id*.) In his deposition, Knauss admitted that his cell had hot water at the time of the incident. (Doc. 90-8, Ex. G, J. Knauss Dep., Apr. 28, 2009.) Further, in his brief in opposition to the instant motion, Knauss asserts that inmate Benson's statement with respect to Knauss' attempts to cause his own injuries is false. (Doc. 100 at 2-4.)

Inmate Shock also was interviewed and provided a written statement. He stated that when Knauss came back from the exchange with Defendants Hannon and Wagner on June 12, he "looked all disgusted and such. . . . Later on Knauss said they roughed him up, that his chest hurt. . . . He said Sgt. Hannon hit him." (Doc. 90-2 at 7.) In his deposition, inmate Shock stated that Knauss told him he had been thrown down on a chair, "roughed up" and "knocked." (Doc. 102-5 at 8.) Inmate Shock also recalled Knauss complaining of soreness. (*Id*.)

---

[4] During the discovery period in this case, inmate Benson refused to be deposed without a subpoena. (Doc. 90-6, Ex. E, M. Benson Dep., Dec. 23, 2008.)

Captain Kneal completed his investigation on June 30, 2008, and determined that Knauss had used personal information about staff in order to "manipulate a situation, resulting in fabricated allegations on COII Hannon." (*Id.* at 8.)  Based on the interviews taken and statements given,[5] Captain Kneal concluded that no assault had occurred, no threats were made, and no profanity used. (*Id.*)

## B.      **Administrative Custody**

On June 16, 2008, Knauss was placed in administrative custody in SCI-Frackville's Restrictive Housing Unit ("RHU") pending the investigation by Captain Kneal. (Doc. 9 ¶ 32; Doc. 91 ¶ 7.)  In his complaint, Knauss alleges that while in administrative custody, he was denied food, recreation, and showers. (Doc. 9 ¶ 33; Doc. 91 ¶ 7.)  Knauss claims that he filed several grievances with respect to the conditions in the RHU, but Defendant Superintendent Shannon destroyed them on July 15, 2008 at 10:00 a.m. (Doc. 9 ¶ 33; Doc. 91 ¶ 7.)

---

[5] Another inmate witness, Eric Bratton, testified at his deposition about his own past interaction with Defendant Hannon, in response to Knauss' allegation that Defendant Hannon had threatened or assaulted inmate Bratton also. (Doc. 90-7, Ex. F, E. Bratton Dep., Apr. 28, 2009.)  Inmate Bratton countered that Defendant Hannon never physically touched him, but had "semi-intimidated" him because Defendant Hannon is an authoritative figure. (*Id.* at 22.)

### C.   July 15 Incident

Knauss claims that he was called to the RHU's property room on July 15, 2008 and questioned there by Defendant Shannon about problems he was causing in the institution and a complaint he had filed in the United States District Court for the Eastern District of Pennsylvania.  (Doc. 90-8 at 24-26, 28-29.)  According to Knauss, when he said something to Defendant Shannon about the Superintendent's father or another relative being killed at SCI-Graterford, Defendant Shannon began destroying Knauss' property, including his federal law books and legal mail.  (*Id*. at 30-31.)  Knauss claims Defendant Shannon's actions were recorded on the RHU's camera.  (Doc. 9 ¶ 34.)  Further, Knauss avers that he attempted to file a grievance regarding Defendant Shannon's actions, but a guard tore up the form.  (Doc. 90-8 at 31.)

In a declaration, Defendant Shannon stated that he was in the RHU on July 15, 2008, but was never in the property room with Knauss.  (Doc. 90-11 ¶ 6, Ex. J, Decl. Superintendent R. Shannon.)  In fact, Defendant Shannon declared that when he was in the RHU that day, Knauss stayed in his cell and the two had no interaction.  (*Id*. at ¶ 7.)

**D.** **Grievances**

In support of the instant motion, Defendants have submitted the declaration of the assistant to Superintendent Shannon, Peter Damiter III, who reviewed the grievances filed by Knauss at SCI-Frackville during June and July 2008. (Doc. 90-12, Ex. K, P. Damiter III Decl.) Mr. Damiter asserts that Knauss filed a total of twenty-one (21) grievances while incarcerated at SCI-Frackville. (*Id*. at ¶ 8.) Knauss filed three grievances in June 2008 and no grievances in July 2008 before he was transferred on July 22, 2008 to SCI-Fayette. (*Id*.) In the first of the three grievances, Grievance No. 230666, Knauss complained that he was not permitted to receive "Playboy" magazine. (Doc. 90-12 at 6, Ex. K, Attach. 2, Grievances.) In the second of the three grievances, Grievance No. 231444, Knauss complained that the food portions served at SCI-Frackville are too small. (*Id*. at 7.) In the last of these grievances, Grievance No. 232305, Knauss complained that when he was called into a misconduct hearing on June 12, 2008, he was denied lunch. (*Id*. at 8.) Further, after Knauss arrived at SCI-Fayette, he filed a grievance on July 28, 2008, claiming that he had not yet received his legal materials from SCI-Frackville. (Doc. 90-11 at 17.)

In an effort to counter the declarations and materials submitted by Defendants, Knauss has submitted briefs in opposition to the motion, (Docs. 99 &

100), a sworn declaration, (Doc. 101), and an exhibit which collects, *inter alia*, a record of his attempts to grieve his complaints with respect to the June 12, 2008 incident involving Defendants Hannon and Wagner, the conditions of his subsequent confinement in the RHU, and the July 15, 2008 incident involving Defendant Shannon (Doc. 102). The following records in that exhibit are related to the June 12 incident. On June 18, 2008, Knauss completed an official inmate grievance form, addressed to Peter Damiter, in which he details the assault by Defendants Hannon and Wagner. (*Id*. at 8.) Knauss notes on that form that he had originally filed his grievance on June 15, 2008, but had not received a response. (*Id*.) That original grievance filed on June 15, 2008 is not attached, nor is receipt of the grievance form acknowledged by the facility grievance coordinator. (*Id*.)

On June 13, 2008, Knauss filed a complaint with the DOC's Office of Professional Responsibility ("OPR"), located in Camp Hill, Pennsylvania, detailing the assault by Defendants Hannon and Wagner. (*Id*. at 4-6.) On that complaint, Knauss noted that he refiled the complaint on July 1, 2008 because he had not yet received a response from the OPR. (*Id*. at 4.) In addition, Knauss noted that he was filing the complaint in accordance with DC-ADM-001, the DOC's "Inmate Abuse Allegation Monitoring" policy.[6] (*Id*.) The OPR responded

---

[6] *See infra* p. 18.

by letters dated July 18, 2008[7] and August 18, 2008, informing Knauss that an investigation into his allegations against SCI-Frackville staff was ongoing and not yet completed. (*Id*. at 9-10.) On November 2, 2008, Knauss sent correspondence to the OPR, noting that he had not yet received a response detailing the outcome of the OPR's investigation. (Doc. 102-6.) There is no record that the OPR completed its investigation and informed Knauss of its findings.

Further, the following records in the exhibit are related to Knauss' complaints about his conditions of confinement in the RHU at SCI-Frackville. On July 15, 2008, Knauss completed an official inmate grievance form, addressed to Peter Damiter, complaining that the RHU guards were intentionally denying him recreation and showers. (Doc. 102 at 16.) On July 17, 2008, Knauss completed an inmate request to staff member, addressed to Peter Damiter, informing him that he was again refused recreation in the RHU. (*Id*. at 15.) Knauss dates the events of these claims as July 15, 2008. (*Id*. at 15-16.) While both of these forms do not indicate acknowledgment of receipt by the facility grievance coordinator, Knauss

---

[7] This response references a correspondence sent from Knauss dated August 2, 2008. (Doc. 102 at 9.) However, Knauss' August 2, 2008 correspondence to the OPR is not in the record.

claims that the originals were never processed by SCI-Frackville officials.[8]  (Doc.

100 at 5.)

Knauss has also submitted the following records related to his legal

property.  On July 28, 2008, Knauss' mother sent correspondence to Judge Joyner

with an attached correspondence to Peter Damiter.  (*Id*. at 20-21.)  In that

correspondence to Peter Damiter, Knauss' mother informs him that Knauss had

not yet received his legal paperwork at SCI-Fayette since his transfer from SCI-

Frackville.  (*Id*. at 21.)  Knauss' mother sent further correspondence to Judge

Joyner on August 4, 2008, informing him that Knauss still had not received his

legal paperwork from SCI-Frackville.  (*Id*. at 18.)  Attached to that correspondence

is the official inmate grievance completed by Knauss, addressed to Peter Damiter

and dated July 28, 2008, requesting his legal paperwork from SCI-Frackville.[9]  (*Id*.

at 19.)

Also in the exhibit filed by Knauss is a response from the chief grievance

coordinator of the DOC's Office of Inmate Grievances and Appeals, dated August

8, 2008, addressing Knauss' complaint about his loss of property.  (*Id*. at 17.)

---

[8] In his deposition conducted for this litigation, Knauss claims that he maintained the carbon copies of the original grievances.  (Doc. 90-8 at 66, Knauss Dep.)

[9] This grievance is also attached as an exhibit to Defendant Shannon's declaration filed in support of the instant motion.  (*See* Doc. 90-11 at 17.)

Specifically, the coordinator provides Knauss with the following response: "You are encouraged to work through institutional channels to resolve your complaint initially. If unable to resolve your complaint informally, be advised that DC-ADM 804 provides a mechanism for all inmates to seek formal resolution for concerns." (*Id*.) This response does not set forth the details of Knauss' complaint, nor is the originally-filed complaint included in the record. Further, in the OPR's August 18, 2008 response to Knauss' correspondence dated August 2, 2008, the OPR advised Knauss to address his concerns regarding his property issues with his Unit Management Team. (*Id*. at 9.) Again, this response does not set forth the details of Knauss' "property issues," nor is the August 2, 2008 correspondence included in the record. Knauss has also attached correspondence from the Assistant County Solicitor for Lehigh County to the Superintendents of SCI-Fayette and SCI-Frackville, dated August 11, 2008, requesting that they "take whatever steps are necessary to deliver Mr. Knauss' legal file to him." (*Id*. at 14.)

On September 3, 2008, Knauss filed an inmate request to staff member at SCI-Fayette, detailing the events surrounding his loss or destruction of property. (*Id*. at 7.) In that request, Knauss states, "I also didn't receive my federal law books and PLN's that the Superintendent destroyed at Frackville in the RHU. Robert Shannon compared his institution to USP-Alcatraz and then he maliciously

and sadistically ripped up all my federal legal books and PLN's and then he continued to throw my Swiss rolls on the ground and then viciously and recklessly stomped on them." (*Id*.) The SCI-Fayette staff member response dated September 4, 2008 advises Knauss: "You must write to Frackville." (*Id*.) There is nothing in the record indicating that Knauss filed a subsequent grievance with SCI-Frackville officials, nor does Knauss assert that he did so.

## II.   <u>Standard of Review</u>

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id*. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260

F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.  Discussion

In their motion for summary judgment, Defendants seek the entry of judgment in their favor on the grounds that Knauss failed to exhaust his administrative remedies with respect to his claims, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996).  In the alternative, Defendants claim that Knauss has not produced sufficient evidence to support his claims.  The court will discuss these arguments in turn.

### A.    Exhaustion of Administrative Remedies

The PLRA requires a prisoner to present his claims through an administrative grievance process before seeking redress in federal court.  The act specifically provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  A prisoner must exhaust administrative remedies as to any claim that arises in the prison setting, regardless of any limitations on the kind of relief that may be gained through the grievance process.  *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).  "[I]t is

beyond the power . . . of any . . . [court] to excuse compliance with the exhaustion

requirement, whether on the ground of futility, inadequacy or any other basis."

*Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) (quoting *Beeson v. Fishkill Corr.*

*Facility*, 28 F. Supp 2d 884, 894-95 (S.D.N.Y. 1998) (citing *Weinberger v. Salfi*,

422 U.S. 749, 766 (1975)).  The PLRA "completely precludes a futility exception

to its mandatory exhaustion requirement."  *Nyhuis*, 204 F.3d at 71.  The PLRA

also mandates that an inmate "properly" exhaust administrative remedies before

filing suit in federal court.  *Woodford v. Ngo*, 548 U.S. 81, 92 (2006).  "Proper

exhaustion demands compliance with an agency's deadlines and other critical

procedural rules because no adjudicative system can function effectively without

imposing some orderly structure on the course of its proceedings."  *Id*. at 90-91.

Such requirements "eliminate unwarranted federal-court interference with the

administration of prisons, and thus seeks to 'affor[d] corrections officials time and

opportunity to address complaints internally before allowing the initiation of a

federal case."  *Id*. at 93 (quoting *Nussle*, 534 U.S. at 525).  Failure to substantially

comply with procedural requirements of the applicable prison's grievance system

will result in a procedural default of the claim.  *Spruill v. Gillis*, 372 F.3d 218,

227-32 (3d Cir. 2004) ("[P]rison grievance procedures supply the yardstick for

measuring procedural default.").  Procedural default is a question of law.  *Id*. at

232. A procedural default, "either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim." *Gallego v. United States*, No. 02-1157, 2005 WL 1653166, at *2 (M.D. Pa. July 8, 2005).

A prisoner does not have to allege in his complaint that he has exhausted administrative remedies; instead, failure to exhaust available administrative remedies is an affirmative defense. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002) Therefore, it must be pleaded and proven by the defendants. *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002).

The Pennsylvania DOC has established several methods by which Pennsylvania inmates can grieve their claims of abuse before seeking redress in federal court. First, the Pennsylvania DOC has an "Inmate Abuse Allegation Monitoring" policy expressing the principle that an inmate should "not [be] subjected to corporal or unusual punishment, ***or personal abuse or injury***." DOC Policy Statement DC-ADM 001, "Inmate Abuse Allegation Monitoring," Part V, "Policy," *available at* http://www.cor.state.pa.us (emphasis in original). In part, "abuse" is defined in the policy as "[c]onduct by an employee . . . that involves . . . the use of excessive force upon an inmate," but which excludes

"conditions of confinement." *Id.*, Part IV(A), "Definitions." An inmate can report

abuse in three ways:

1. report it verbally or in writing to any staff member;

2. file a grievance in accordance with Department policy DC-ADM 804, "Inmate Grievance System;" or

3. report it in writing to the Department's Office of Professional Responsibility (OPR).

*Id.*, Part VI(D), "Procedures."

Further, the Pennsylvania DOC has an inmate grievance system which

permits any inmate to seek review of problems that may arise during the course of

confinement. 37 Pa. Code § 93.9(a); *see also* DC-ADM 804, "Inmate

Grievances," *available at* http://www.cor.state.pa.us. After an attempt to resolve

any problems informally, an inmate may submit a written grievance to the

facility's Grievance Coordinator for initial review. An inmate may then appeal an

adverse decision of the Grievance Coordinator to the Superintendent of the

institution, and can finally appeal to the Secretary of the DOC Office of Inmate

Grievances and Appeals. *See Booth v. Churner*, 206 F.3d 289, 293 n.2 (3d Cir.

2000) (outlining Pennsylvania's grievance review process). Moreover, DC-ADM

804 specifically provides that: "A grievance dealing with allegations of abuse shall

be handled in accordance with Department policy DC-ADM 001, 'Inmate Abuse

Allegation Monitoring Process.'"  DC-ADM 804, Part VI(B)(10), "Procedures - Initial Review."

Here, Defendants' motion for summary judgment is based in part on the assertion that Knauss failed to exhaust his available administrative remedies under DC-ADM 804.  In support, Defendants assert that a printout of the number of grievances filed by Knauss while incarcerated at SCI-Frackville during the relevant time period of June and July 2008 reveals that Knauss filed three grievances in June 2008 and no grievances in July 2008.  (Doc. 90-12, Ex. K.) None of the grievances filed in June 2008 is related to Knauss' instant claims. However, while the three grievances are attached to Defendants' exhibit, the "printout" setting forth all of Knauss' filed grievances, and referred to by Defendants, does not appear to be attached.[10]  Without the proper record referred to by Defendants or evidence countering Knauss' claim that grievances were destroyed or not processed by DOC Defendants, the court cannot make a ruling on exhaustion based on Defendants' supporting documentation alone.

---

[10] The only printout attached to Defendants' exhibit, Peter Damiter's declaration, is one that references grievances filed on the following dates, entered in the reverse chronological order: 8/31/2007, 6/22/2007, 6/20/2007, 6/8/2007, 5/29/2007, 5/3/2007, 2/26/2007.  (Doc. 90-12 at 5.)

### 1.   <u>June 12 Incident</u>

In their reply brief to the instant motion, Defendants argue that Knauss'

submission of documentation showing that he filed complaints with the OPR

about the June 12, 2008 incident is not relevant because "[t]he administrative

remedies that are provided for prisoners under the PLRA does not encompass

inmates sending complaints to the Office of Professional Responsibility." (Doc.

105 at 3.)  The court disagrees.  As noted above, DC-ADM 001 permits an inmate

to report a claim of abuse either by grieving it under DC-ADM 804 or by reporting

it under DC-ADM 001.[11]  Further, as set forth by the Third Circuit Court of

Appeals, "a prisoner's civil rights case may be heard on the merits notwithstanding

the failure to file a DC-ADM 804 grievance under certain limited circumstances."

*Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005) (citing *Camp v. Brennan*,

219 F.3d 279, 281 (3d Cir. 2000) (exhaustion requirement met where the OPR

fully examined merits of excessive force claim and correctional officers may have

impeded filing of grievance)).  Here, the record reflects that Knauss pursued his

grievance to the OPR under DC-ADM 001, the only step he had to take under that

policy. (*See* Doc. 102 at 4-6.)

---

[11] The third method is a verbal or written report to any staff member.

In opposition to Defendants' claim of his failure to exhaust, Knauss makes several assertions in support of his contention that his failure to exhaust should be excused by the court. Specifically, Knauss asserts that he reported the assault to prison staff and Judge Joyner,[12] filed two complaints with OPR, and filed two grievances. (Doc. 100 at 4.) He asserts that the OPR has not yet responded to his complaints filed in June and July 2008. (Doc. 102-6.)

Under DC-ADM 001, when an inmate files a report with the OPR, the following procedures apply:

a. An investigation assigned to the OPR shall be completed within 30 working days of receipt of the investigative order;

b. a letter shall be prepared by the OPR to the complainant advising him/her of the results of the investigation;

c. a letter shall be prepared by the OPR to the Facility Manager; and

d. if the investigation exonerates the accused staff, a letter shall be prepared by the OPR advising the subjects.

DC-ADM 001, "General Procedures," Part D(7), "Investigating Allegations of Abuse." Here, the record reflects no correspondence from the OPR aside from the two initial letters sent to Knauss on July 18, 2008 and August, 18, 2008. (Doc.

---

[12] Knauss' correspondence to Judge Joyner, a federal district court judge, is not relevant to the issue of whether Knauss exhausted available administrative remedies with the Pennsylvania Department of Corrections with respect to the instant claims and therefore will not be considered in the court's disposition of this issue.

102 at 9-10.) Both of these letters inform Knauss that an investigation into his complaint has not yet been completed.[13] (*Id.*) Further, the record shows that Knauss was still attempting to elicit a response from the OPR in November 2008, months after he filed his complaint, and still to no avail. (Doc. 102-6.) As Defendants have not provided the court with any documentation in support of a timely investigation and findings completed by the OPR, the court finds that Knauss has set forth a compelling reason to excuse compliance with the exhaustion requirement for his claims relating to the June 12, 2008 incident.

### 2. <u>Administrative Custody</u>

Defendants also claim that Knauss failed to exhaust his administrative remedies relating to the conditions in administrative custody in the RHU. (Doc. 89 at 11.) Knauss, however, counters that he did file relevant grievances but those grievances were either destroyed by Defendant Shannon or SCI-Frackville officials failed to process them. (Doc. 100 at 4-5.)

Courts have held that affirmative misconduct by prison officials - designed to impede or prevent an inmate's attempts to exhaust - may render administrative remedies unavailable. *See Todd v. Benning*, 173 F. App'x 980, 982 (3d Cir. 2006)

---

[13] On the other hand, Captain Kneal's investigation, ordered by Superintendent Shannon, was completed on June 30, 2008. (Doc. 90-2 at 8.) There is no record of cooperation between Captain Kneal and the OPR.

(expressing approval of Eighth Circuit's holding in *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001) that administrative remedies were not available where prison officials "purportedly prevented prisoner from employing the prison's grievance system"). Examples of affirmative misconduct on the part of prison officials include: (1) threatening a prisoner in an attempt to thwart the prisoner's attempts to exhaust, *see, e.g.*, *Harcum v. Shaffer*, No. 06-5326, 2007 WL 4167161, at *5 (E.D. Pa. Nov. 21, 2007) (finding administrative remedies unavailable where prison officials threatened plaintiff with "opposition to his future prerelease application, parole, or outside work detail if he did not withdraw his grievance"), (2) refusing to provide appropriate grievance forms in response to inmate inquiries, *see, e.g.*, *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003), (3) advising an inmate that his or her situation does not require a grievance, *see, e.g.*, *Brown*, 312 F.3d at 111-12 (finding that administrative remedies were unavailable to a plaintiff who had been advised by prison officials that he must wait until the end of the prison's investigation before filing a grievance), and (4) failing to file or respond to a prisoner's grievances, *see, e.g.*, *Camp*, 219 F.3d at 280-81 (finding that administrative remedies were unavailable where prison officials refused to file plaintiff's grievances regarding their coworkers).

In the instant motion, Defendants assert that Knauss failed to exhaust his administrative remedies relating to the conditions of administrative custody claims. In opposition, Knauss has submitted "carbon copies" of two relevant grievances he attempted to file on July 15 and 17, 2008, with SCI-Frackville officials. (Doc. 102 at 15-16.) In those grievances, Knauss dates the events leading to his claims as July 15, 2008. (*Id*.) DOC protocol provides an inmate fifteen working days from the date on which the basis for a grievance occurred to initiate that grievance. DC-ADM 804, Part VI(A)(8), "Procedures, Initial Grievance." Under this DOC procedure, Knauss had until August 5, 2008, to file a grievance about the conditions in the RHU. Here, Knauss alleges that he did attempt to file such grievances, but states that either Defendant Shannon destroyed the original copies of the grievances or that unnamed SCI-Frackville corrections officers failed to process them. (Doc. 100 at 4-5.) As such, Knauss is clearly alleging that Defendants engaged in conduct that was designed to impede or prevent his attempts to exhaust his claims relating to the conditions in the RHU. (Doc. 100 at 4-5.) *See also Todd*, 173 F. App'x at 982.

While Knauss' allegations of misconduct by Defendants set forth a compelling reason to excuse compliance with the exhaustion requirement for his claims relating to the RHU, the court notes that the grievance process did become

25

available to Knauss again by July 28, 2008, the day he filed an unrelated grievance from SCI-Fayette and addressed to Peter Damiter at SCI-Frackville. (Doc. 90-11 at 17; Doc. 102 at 19.) As he had until August 5, 2008 to file a grievance related to the conditions in the RHU, clearly a grievance filed from SCI-Fayette between July 28, 2008 to August 5, 2008 would have been timely. As the record shows that Knauss had the opportunity to timely file a grievance relating to the RHU conditions and chose not to do so, his decision not to file such a grievance does not render exhaustion futile and therefore excused. Thus, Defendants have satisfied their burden of establishing that Knauss' claim was not administratively exhausted. Accordingly, the court will grant Defendants' motion with respect to this claim. *See Spruill*, 372 F.3d at 227-32.

### 3. July 15 Incident

Defendants also contend that Knauss has failed to exhaust his administrative remedies with respect to his claim against Defendant Shannon for destruction of his legal property on July 15, 2008. Knauss has submitted a number of records in an attempt to counter this argument. Those submissions are as follows.

On July 28, 2008, Knauss filed a grievance from SCI-Fayette and addressed to Peter Damiter at SCI-Frackville in which he requested that his legal paperwork be sent from SCI-Frackville to SCI-Fayette, where he was transferred on July 22,

26

2008.  (Doc. 90-11 at 17; Doc. 102 at 19.)  On August 8, 2008, the DOC's Office

of Inmate Grievances and Appeals' chief grievance coordinator responded to a

grievance filed by Knauss relating to property, informing him that he should work

through institutional channels informally before contacting that office.  (*Id*. at 17.)

In a response from the OPR dated August 18, 2008, Knauss was advised to raise

his concerns regarding his property issues with his Unit Management Team.  (*Id*.

at 9.)  Neither the August 8, 2008 or August 18, 2008 response refers to Knauss'

allegations of destruction of his legal property by Defendant Shannon.  Finally, on

September 3, 2008, Knauss filed an inmate request to staff member at SCI-Fayette

detailing the events surrounding the destruction of his legal property.  (*Id*. at 7.)

The staff member response was, "You must write to Frackville."  (*Id*.)  There is

nothing in the record indicating that Knauss did so.

As stated above, an inmate has fifteen working days from the date of an

incident to file a grievance.  DC-ADM 804, Part VI(A)(8), "Procedures, Initial

Grievance."  Here, Knauss claims Defendant Shannon destroyed his legal property

on July 15, 2008.  As such, he had until August 5, 2008 to file a grievance.

However, the record reflects that Knauss did not attempt to grieve his claims with

respect to Defendant Shannon until September 3, 2008, with the inmate request to

staff member filed at SCI-Fayette.[14]  Further, the response to that grievance

directed Knauss to file a grievance with SCI-Frackville officials.  However, there

is nothing in the record to indicate that Knauss followed the response's directive

or appealed the response to SCI-Fayette's Superintendent or the DOC's Office of

Inmate Grievances and Appeals.[15]  Therefore, Knauss' failure to comply with the

requirements set forth in the DOC's grievance procedure renders this claim

procedurally deficient.  *See Spruill*, 372 F.3d at 227-32.

Moreover, in Knauss' deposition taken in connection with this litigation,

Knauss asserts that he attempted to file a grievance about Defendant Shannon's

actions on July 15, 2008, but a SCI-Frackville guard tore it up.[16]  (Doc. 90-8 at

31.)  This assertion, however, does not excuse exhaustion in this case.  As set forth

above, while Knauss claims the grievance procedure was not available to him

while incarcerated in SCI-Frackville's RHU, thus rendering exhaustion futile, the

record reflects that the grievance process became available to Knauss again by

---

[14] Knauss' remaining submissions, inexplicably referencing the legal property Knauss now claims had been destroyed previously on July 15, 2008, are either requests or responses thereto for shipment of his legal property from SCI-Frackville to SCI-Fayette.

[15] *See supra* pp. 18-19.

[16] Knauss does not make this assertion in his submissions filed in opposition to the instant motion for summary judgment.  However, erring on the side of caution, and as this contention is included in the record, the court will address it.

July 28, 2008, the day he filed an unrelated grievance from SCI-Fayette and addressed to Peter Damiter at SCI-Frackville. (Doc. 90-11 at 17; Doc. 102 at 19.) As he had until August 5, 2008 to file a grievance about the July 15, 2008 incident involving Defendant Shannon,[17] clearly a grievance filed from SCI-Fayette between July 28, 2008 to August 5, 2008 would have been timely. As the record shows that Knauss had the opportunity to timely file a grievance relating to the Defendant Shannon's actions, and chose not to do so until September 3, 2008, his untimely filing does not render exhaustion futile and therefore excused.

Further, in his deposition, Knauss claims that he filed a related complaint with the OPR. (Doc. 90-8 at 31.) While this complaint is not in the record, a response from the OPR dated August 18, 2008, addressing a correspondence from Knauss dated August 2, 2008, directs Knauss to address his concerns with his property issues with his Unit Management Team. (Doc. 102 at 9.) *Assuming arguendo* the grievance filed on September 3, 2008 is in response to that directive, the court has already determined that that grievance does not satisfy the exhaustion requirements of the PLRA. *See supra* pp. 26-28. Thus, Defendants have satisfied their burden of establishing that Knauss' claim was not

---

[17] Per DOC protocol, Knauss had fifteen working days from July 15, 2008, or until August 5, 2008, to file a grievance.

administratively exhausted.  Accordingly, the court will grant Defendants' motion with respect to this claim.  *See Spruill*, 372 F.3d at 227-32.

**B.**     **June 12 Incident - Merits**

As the court has already determined that Knauss has set forth a compelling reason to excuse compliance with the exhaustion requirement for his claims relating to the June 12, 2008 incident, the court will now address the merits of those claims.

A plaintiff, in order to state a viable § 1983 claim, must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution and laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988).  Liability under § 1983 is personal in nature and a defendant is liable only if he was personally, affirmatively involved in the alleged wrongdoing.  *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  A defendant who supervised the wrongdoer but did not personally participate in the wrongful act is not liable under § 1983 on a theory of *respondeat superior* unless he personally directed or had actual knowledge of, and

acquiesced in, the deprivation. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981)

(citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978));

*Robinson*, 120 F.3d at 1294. A defendant who lacked any supervisory power over

the wrongdoer and who was not personally, affirmatively involved in the alleged

wrongful conduct is not liable under § 1983. *Id.*

### 1. *Respondeat Superior*

Defendants contend that summary judgment should be granted in favor of

Defendant Shannon with respect to the June 12 claims because Knauss has failed

to allege any personal involvement by Superintendent Shannon in violating his

constitutional rights on that date. Defendants argue that Superintendent Shannon

cannot be held liable solely on the basis of *respondeat superior*. The court agrees.

It is well established that civil rights claims cannot be premised on the

theory of *respondeat superior*. *Rode*, *supra,* 845 F.2d at 1207. Rather, each

named defendant must be shown to have been personally involved in the events or

occurrences which underlie a claim. *See Rizzo v. Goode*, 423 U.S. 362, 371-72

(1976); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir.

1976). Liability cannot be based solely on the basis of a defendant's supervisory

capacity. The plaintiff must allege that the official had knowledge of or

acquiesced in any purported acts of constitutional mistreatment. *See Rode*, 845

F.2d at 1207.

In his amended complaint, Knauss claims that Defendants Hannon and

Wagner participated in the assault against him on June 12, 2008. Nowhere in the

amended complaint does Knauss allege that Defendant Superintendent Shannon

had any personal involvement in this incident. He does assert that Defendant

Shannon "cover[ed] up the assault," (Doc. 9 at 7),[18] but none of the evidence on

record substantiates this claim.

In opposing summary judgment, Plaintiff cannot rely on the allegations

contained in his complaint. Instead, he must "go beyond the pleadings and by

[his] own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue

for trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). (internal

quotations omitted). Summary judgment should be granted where a party "fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *See*

---

[18] In his amended complaint, Knauss also alleges that under Pennsylvania law Defendant
Shannon committed the tort of conspiracy when he covered up the assault. (Doc. 9 at 7.)
However, as he has failed to demonstrate that Defendant Shannon had any personal involvement
in the June 12 incident, Knauss' state law claim of conspiracy will be denied.

*id.,* at 322. Here, Knauss has failed to support his allegation that Defendant Shannon had any personal knowledge of the incident which allegedly took place or acquiesced in it. Thus, his claim against Defendant Shannon is constitutionally insufficient and Defendant Shannon is entitled to an entry of summary judgment.[19]

### 2.   Verbal Threats

Knauss claims that Defendant Hannon verbally threatened him with violence on June 12, 2008. Assuming these claims are true, it is well-settled that mere words spoken to a prisoner by a correctional officer, even when those words are harsh, do not amount to a violation of the prisoner's civil rights by the officer. *Johnson v. Glick*, 481 F.2d 1028, 1033 n.7 (2d Cir. 1973); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (verbal harassment by threatening to hang an inmate is not sufficient to state a constitutional deprivation under § 1983); *Ruta v. Morris*, No. 3:cv-07-1832, 2007 WL 3342771, at *2 (M.D. Pa. Nov. 7, 2007) (claim of verbal assault fails to state a cognizable claim). "Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a

---

[19] Knauss' claim also fails under the scenario that "a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so" as it is clear that Defendant Shannon was not present during the alleged assault. *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002).

prisoner of a protected liberty interest or deny a prisoner equal protection of the laws." *Dewalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000).

Verbal threats or harassment, with some reinforcing act accompanying them, however, may state a constitutional claim. *Murray v. Woodburn*, 809 F. Supp. 383, 384 (E.D. Pa. 1993). For example, a viable claim has been found if some action taken by the defendant escalated the threat beyond mere words. *See Northington v. Jackson*, 973 F.2d 1518, 1523-24 (10th Cir. 1992) (guard put a revolver to an inmate's head and threatened to shoot); *Douglas v. Marino*, 684 F. Supp. 395, 397-98 (D.N.J. 1988) (prison employee threatened an inmate with a knife). It has also been found that verbal harassment can rise to a constitutional level in a situation where fulfillment of the threat was conditioned on the inmate's exercising some constitutionally protected right. *Bieros v. Nicola*, 860 F. Supp. 226, 233 (E.D. Pa. 1994).

Knauss asserts that Defendant Hannon threatened to kill him, put a hole in his chest, and knock him unconscious. (Doc. 9 at 3-5.) There is no indication that any of these verbal threats were accompanied by a reinforcing act involving a deadly weapon as contemplated under *Northington* and *Douglas*. Moreover, in a similar case in this district, the court concluded that a verbal threat accompanied by a one-time slap to the back of the head did not set forth a viable constitutional

claim. *Cyrus v. Hogsten*, No. 4:06-cv-2022, 2007 WL 136747, at * 9 (M.D. Pa. Jan. 16, 2007) (McClure, J.). Further, a review of the amended complaint also shows that the alleged threats were not conditioned on the prisoner's exercise of a constitutionally protected right. Thus, Knauss' allegations of verbal threats do not rise to the level of a constitutional violation.

### 3. Eighth Amendment Excessive Use of Force

In the instant case, Knauss claims that Defendant Hannon used excessive force on June 12, 2008, when Knauss was called to the Unit Manager's office to discuss the way in which he was addressing certain correctional officers.[20] In order for Knauss' § 1983 claim to proceed against Defendant Hannon, he must first establish the existence of a constitutional violation. Accordingly, the court will first address this threshold inquiry.

---

[20] Knauss alleges in his amended complaint, and repeats in his brief in opposition to the motion for summary judgment, that Defendant Wagner did not participate in the alleged assault; rather, he witnessed Defendant Hannon's actions and served as a "lookout." (*See* Doc. 9 at 3; Doc. 99 at 2.) (*See also* Doc. 9 at 5; Doc. 102 at 6 ("Defendant Wagner stood watch but did not participate in the assault."); Doc. 100 at 2 ("Defendant Wagner was present and failed to prevent this assault and continuous threats against the plaintiff's life to cause serious bodily injury."); Doc. 90-8 at 37-38, Knauss Dep. ("Wagner didn't do nothing but just standby and watch what Hannon was going to do. That's all Wagner did."); *Id*. at 41 ("Wagner was just standing there at the door guarding the door and on the lookout . . . ."); *Id*. at 53 ("I told [SCI-Frackville staff] it's Hannon and - - - Wagner wasn't really a problem."). Given Knauss' repeated assertions, the court will liberally construe Knauss' allegations that Defendant Wagner witnessed the alleged assault and failed to report it as failure-to-protect and failure-to-intervene claims. *See infra* pp. 37-39.

In order for a prisoner to state an Eighth Amendment claim for the excessive use of force by a prison official, he must establish that the force was not applied in a good-faith effort to maintain or restore discipline, but that it was maliciously and sadistically used to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). "In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) 'the need for the application of force;' (2) 'the relationship between the need and the amount of force that was used;' (3) 'the extent of injury inflicted;' (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them;' and (5) 'any efforts made to temper the severity of a forceful response.'" *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). The prisoner need not show significant injury to state an excessive use of force claim. *Hudson*, 503 U.S. at 8, 10. However, "[t]hat is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de mimimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id*. at 9-10 (citations omitted).

Here, Defendants Hannon and Wagner concede that they did speak with Knauss in the Unit Manager's office on June 12, but deny that an assault or physical altercation of any type took place. (Doc. 89 at 18-19; Doc. 91 ¶ 14.) In support of his claim, Knauss submits the deposition testimony of his cellmate at the time of the June 12 incident, inmate Shock, who states that Knauss was called out of their cell that day by corrections officers, and that upon his return from the meeting in the Unit Manager's office, Knauss told him he had been thrown down on a chair, "roughed up" and "knocked." (Doc. 102-5 at 8.) Inmate Shock also recalled Knauss complaining of soreness. (*Id.*) Knauss also submits his own affidavit stating that during the June 12 incident, "Defendant Hannon . . . told me to sit down, he then without warning punched me in my chest and I fell into the chair." (Doc. 101 at 2.) Further, at his deposition Knauss stated that the medical department "told me I was going to be in pain - - the nurse told me I was going to be in pain for a while, because my chest was all swollen up. Told me just keep the ice on there." (Doc. 90-8 at 55, Knauss Dep.) These conflicting accounts of what transpired create a genuine issue of material fact as to whether Knauss was subjected to excessive force on June 12, 2008. Stated otherwise, even if Knauss is determined to have been assaulted, there remains substantial disputed facts as to whether the assault was an excessive use of force under the standard set forth in

*Hudson*.  Accordingly, Defendants' motion for summary judgment will be denied as to Defendant Hannon and the matter will proceed to trial on this claim.

**4.    Claims against Defendant Wagner**

To the extent that the court can liberally construe the allegations that Defendant Wagner was present during the alleged assault and failed to report it as a failure-to-protect claim and failure-to-intervene claim,[21] the court concludes that Knauss has failed to state a claim against Defendant Wagner.

Turning first to a failure-to-protect claim, it is well-settled that the Eighth Amendment requires that prison officials "take reasonable measures to guarantee the safety of the inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted).  In order to prevail on an Eighth Amendment failure-to-protect claim, an inmate is required to show that (1) he is incarcerated under conditions posing a substantial risk of serious harm (objective element); and (2) prison officials acted with deliberate indifference, that is, that prison officials knew of and disregarded an excessive risk to inmate health or safety (subjective element). *Farmer*, 511 U.S. at 833-34, 847.  *See also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (citing *Farmer*, 511 U.S. at 833-34, 38).

_____

[21] *See supra* note 20, at 34.

In the instant case, Knauss has not met either the objective or subjective element of a failure-to-protect claim against Defendant Wagner. Initially, Knauss has not demonstrated a substantial risk of serious harm because, as discussed herein, the force used and injury sustained were minor. Moreover, "[a] pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents." *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985) (citations omitted). Further, Knauss has not sufficiently alleged that Defendant Wagner was deliberately indifferent to Knauss' health or safety, as there is no allegation that Defendant Wagner had any knowledge that Defendant Hannon would strike Knauss. Thus, because Defendant Wagner could not have been deliberately indifferent to a risk of which he was unaware, Knauss has failed to state a claim of failure-to-protect against Defendant Wagner. *See, e.g., Matthews*, 2009 WL 311177, at *5.

Turning to a failure-to-intervene claim, in a case where an inmate claims an officer had a duty to take reasonable steps to protect a victim from another officer's use of excessive force, the inmate must prove that (1) the officer had a duty to intervene; (2) the officer had the opportunity to intervene; and (3) the officer failed to intervene. *Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002). Specifically, "an officer is only liable if there is a realistic and reasonable

opportunity to intervene." *Id.* at 651. Here, even assuming there was an excessive use of force by Defendant Hannon, Knauss has not shown that Defendant Wagner had knowledge of what Defendant Hannon would do, or that Defendant Wagner had the opportunity to intervene in the sudden and momentary use of force by Defendant Hannon. As Defendant Wagner had no opportunity to intervene to protect Knauss from the alleged constitutional violation, any claim based on a failure to do so must be dismissed.

## 5. State Law Claim of Assault

In his amended complaint, Knauss alleges that under Pennsylvania law Defendant Hannon committed the tort of assault in connection with the June 12 incident.[22] However, Defendant Hannon is statutorily immune from suit with regard to this pendant state law claim.[23]

Under Pennsylvania's sovereign immunity statute, "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to

---

[22] In the amended complaint, Knauss alleges that all Defendants participated in the tortious assault on June 12, 2008. However, as the court has already determined that Knauss' allegations of assault are related to Defendant Hannon alone, this state claim will be construed against Defendant Hannon only.

[23] Defendants did not raise the defense of sovereign immunity. However, the court will raise it here because, as set forth by the Third Circuit Court of Appeals, sovereign immunity may be raised by a party at any time, even on appeal, and a court may *sua sponte* raise the issue as it relates to its own jurisdiction. *See Walsh v. United States*, 328 F. App'x 806, 809 (3d Cir. 2009) (citing *United States v. Bein*, 214 F.3d 408, 412 (3d Cir. 2000)).

enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. Cons. Stat. Ann. § 2310. Further, at 42 Pa. Cons. Stat. Ann. § 8522, the General Assembly specifically waived sovereign immunity in nine areas.[24] Because the Pennsylvania Department of Corrections is an agency of the Commonwealth of Pennsylvania, it is governed by § 8522, which does not provide an exception for willful misconduct. *See Lavia v. Pennsylvania Dept. of Corrections*, 234 F.3d 190, 195 (3d Cir. 2000); *Holt v. Northwest Pennsylvania Training P'ship Consortium, Inc.*, 694 A.2d 1134, 1140 (Pa. Commw. Ct. 1997) ("[W]illful misconduct does not vitiate a Commonwealth employee's immunity because sovereign immunity protects a Commonwealth employee acting within the scope of his or her employment from liability, even for intentional acts . . . .").

---

[24] The nine exceptions to sovereign immunity pursuant to 42 Pa. Cons. Stat. Ann. § 8522 are:

> (1) operation of any motor vehicle in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions; (3) care, custody, or control of personal property in the possession or control of Commonwealth parties; (4) dangerous condition of Commonwealth agency real estate and sidewalks; (5) dangerous condition of highways under the jurisdiction of Commonwealth agency created by potholes or sinkholes or other similar conditions created by natural elements; (6) care, custody, or control of animals in the possession or control of a Commonwealth party; (7) sale of liquor at Pennsylvania liquor stores; (8) acts of a member of the Pennsylvania military forces; and (9) administration, manufacture and use of toxoid or vaccine.

41

Here, Knauss' state law claim against Defendant Hannon is barred by Pennsylvania's sovereign immunity statute. Regardless of whether contact occurred, there is no dispute that Defendant Hannon was acting within the scope of his employment when he called Knauss to the Unit Manager's office to discuss the way in which Knauss was addressing certain corrections officers. Moreover, this claim does not fall into any of the nine categories of waiver. 42 Pa. Cons. Stat. Ann. § 8522. *See, e.g., Collins v. Bopson*, 816 F. Supp. 335, 341-42 (E.D. Pa. 1993) (corrections officers immune from inmate's state claims in excessive force action). Thus, Defendant Hannon is entitled to sovereign immunity on Knauss' state law claim of assault. *See Story v. Mechling*, 412 F. Supp. 2d 509, 519 (W.D. Pa. 2006) (concluding that defendant was entitled to sovereign immunity because he "was acting within the scope of his employment at the time of the alleged 'assault' and because 'assault' does not fall within any of the nine exceptions to sovereign immunity"). Therefore, this claim must be dismissed.

**IV.  Conclusion**

For the reasons set forth herein, the motion for summary judgment will be granted as to Defendants Shannon and Wagner.  Further, the motion for summary judgment will be denied with respect to Defendant Hannon and the matter will proceed to trial.

An appropriate order follows.

s/Sylvia H. Rambo
United States District Judge

Dated:  February 12, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH RONALD KNAUSS,** | : | **CIVIL NO. 1:CV-08-1698** |
| | : | |
| **Plaintiff** | : | **(Judge Rambo)** |
| | : | |
| **v.** | : | |
| | : | |
| **ROBERT D. SHANNON,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## O R D E R

In accordance with the attached memorandum of law, **IT IS HEREBY**

**ORDERED THAT**:

1) The motion for summary judgment (Doc. 87) is **GRANTED** with respect

to Defendants Shannon and Wagner.

2) Entry of judgment on their behalf is **DEFERRED** pending further order

of court.

3) The motion for summary judgment (Doc. 87) is **DENIED** with respect to

Defendant Hannon.

4) The court will issue a separate scheduling order.

s/Sylvia H. Rambo
United States District Judge

Dated: February 12, 2010.